Thank you, your honors. As you know, this is a social security claim. Mr. Saunders approved that he was unable to perform his past work, and at that point the burden of proof shifted to the administration to show he could do other jobs. There are specific errors of law we believe were made that require vacature of the ALJ's decision. First, we do note that the administrative law judge did not give us a function-by-function assessment of residual functional capacity, and that is required both by case law as well as social security policy rulings. Those policy rulings are binding on the administration, and there is case law to that effect. In this case, the judge just gave us a classification of work indicating light and unskilled. Without that function-by-function assessment, it's really not possible to determine whether there's sufficient findings at step five to show that Mr. Saunders would be able to sustain an eight-hour workday five days a week on a regular and continuing basis. Mr. Slepin, this is Judge Bail. You say there was no function-by-function assessment in the RFC assessment, but didn't the ALJ determine or have the vocational expert determine that Saunders could not crawl, crouch, climb, squat, or kneel, could not use his lower extremities for pushing and pulling, and his upper extremities for work above the shoulder level. So, therefore, he had to have unskilled light work, which required him to have an option to sit down from time to time. What's wrong with that function-by-function assessment? The problem that we run into, Your Honor, is the terms unskilled and light work. Those are broad categories of work. In this case, the ALJ found that Mr. Saunders would need a sit-stand option, and that tells us that Mr. Saunders would have difficulty both sitting for prolonged periods of time and standing for prolonged periods of time. Therefore, because there's an impairment that's reasonably expected to affect sitting and standing, the administrative law judge was required to tell us over an eight-hour period of time how long Mr. Saunders would be able to sit or stand for. You cannot just say light work, but you have to say he can sit X amount of hours a day, or he could stand Y amount of hours a day. What's wrong with saying he has the option to stand and sit whenever he pleases, such as a person, such as a cashier at a parking lot has? The administrative law judge can assign a sit-stand option, but we run across two problems in this particular case. Assuming Mr. Saunders needs a sit-stand option, can he sit more than two hours in a day? Can he sit more than four hours a day? Can he sit more than six hours in a day? We don't know, because the administrative law judge doesn't tell us. In addition to that, can he stand two hours? Can he stand four hours? Can he stand eight hours? Do you have any... That's another question that hasn't been answered. Do you have any cases that say that a ALJ violates the law because he doesn't quantify the amount of intermittent hours that a person can stand or sit during the day? The most clear law on this point would be that contained within Social Security Policy Ruling 96-8P, which specifically prohibits saying that an individual can perform light work. Are you going to address the credibility question? I'm sorry, I didn't hear you, Your Honor. Are you going to address the credibility issues? Yes, I am ready to... Okay. So, moving on to the credibility issue... Did you finish addressing Judge Beyer's question? Well, the strongest case law is 96-8P. There are also a couple of other cases. We have the Reid case, which is cited in my brief, which indicates that you need a specific sit-stand option. I mean, you need a specific RFC assessment. And I also did point to the... No, no. I understand, Mr. Slepian. What I'm saying, what I'm asking is, because I haven't found it, is there any case which has reversed an SSA denial because the ALJ, when he has said that the jobless, light, unskilled job allows a sit-stand option, hasn't gone further to say... And what I mean by that is that I find that he can stand for two hours, sit for two hours, stand for two hours, sit for two hours. In other words, a temporal dissection of the day. Are you saying that there's some case that requires that of an ALJ? There were, in the cases that I cited, there were multiple reasons for vague picture of the ALJ decision. That is one of them. All right. I'll take a look at those cases in the brief. Why don't you turn to the ALJ's adverse credibility decision, that is, he discredited the plaintiff's pain testimony. Yes, Your Honor. What was wrong with that decision? Okay. There are a number of things. But first, I want to point out to the judge's finding that Mr. Saunders is incredible because Dr. McPhee assessed this wide range of functional capacity, as well as Dr. McPhee's statement that Mr. Saunders groaned what he believed to be out of proportion. What I would ask this court to do is look at the impairments that Mr. Saunders suffers and compare them to this report from Dr. McPhee. Mr. Saunders suffers from the degenerative disc disease of the cervical spine with impingement on the nerve root. The administrative law judge found that Mr. Saunders suffers from severe cervical degenerative disc disease. And then look at Dr. McPhee's report. There's no diagnosis of degenerative disc disease in the cervical or lumbar spine. The physician completely missed it. The doctor didn't look at an MRI. He didn't have any of the evidence before him. Was there an MRI? I thought part of the problem here is that there was a partial MRI from in 2007 that he had an MRI, but as far as I could tell, he didn't have an MRI. Is that right? And that was part of what the ALJ relied on, right? That he hadn't had any recent radiology that backed up his claim of objective impairment. I believe there were two cervical MRIs that were performed, both of which showed this degenerative disc disease with nerve root impingement. I'll flip through and try to give you a page number on that, but I did note that two of them. I thought they were both pretty long before the onset date, but also that's only partial, right? Because he was basically claiming about lower back pain, and there was no MRI for that. Correct. There was no lumbar MRI, but there was that cervical MRI. One of the issues we have in this case is the records repeatedly talk about Mr. Saunders not having medical insurance, not being able to afford the treatment. But in this case, if you look at Dr. McPhee's report, Mr. Saunders comes into him and says, my disability is based on my neck. And then if you look at Dr. McPhee's report, there's very little testing of the neck. There's no diagnosis of neck pain. Dr. McPhee writes that maybe the claimant has fibromyalgia. He doesn't even get the correct diagnosis. I don't know any area of law where you could be allowed to do a physical examination on a claimant, not review records, don't run any tests, and just look at him and say, oh, this is what he must have. And then when you look at the decision, the judge even says, that's not what he has. McPhee didn't look at any records, right, which is odd. The Social Security Administration had the records. They just never gave them to Dr. McPhee. And they sent him to Dr. McPhee for this evaluation, and they don't even send records along with it. And Dr. McPhee apparently didn't even know what part of the body he was examining until he spoke to Mr. Saunders. And then Dr. McPhee doesn't comment on the neck impairment at all. The ALJ just didn't rely on Dr. McPhee to discredit Saunders' pain testimony. What about the other items that the ALJ pointed to? The other item he pointed to was alleged daily activities in taking care of a disabled fiancé. Nowhere in this record is there an indication as to what Mr. Saunders did for this fiancé and how it would be inconsistent with disability. The case was clear that the activities must transfer to the grueling work pace,  Mr. Saunders had assistance from children who, when I say children, we're talking about teenagers. We're not talking about incapacitated individuals. And it indicates that what he did was at a very light level of activity. And so when you look at cases like FAIR or Smolin v. Chater, these are not the type of activities that would be inconsistent with an ability to sustain work. What about the use of the brace and the cane at the examination by McPhee when no brace or no cane had ever been prescribed by any treating physician? In terms of the brace, that's a wrist brace. Mr. Saunders testified that it was recently he started to use it because he developed some wrist pain and it wasn't the basis for his disability. I mean, the wrist brace is just a red herring here. In terms of his cane, he said it wasn't prescribed, but I use it because it helps me. There's no credibility issue here. I mean, if he said, yes, it was prescribed by the doctor and I need it, you would have a different situation. But here, you have an honest guy. He came in and he said, yeah, I use it. And, you know, the judge found Mr. Saunders can't stoop, crawl, climb. So, clearly, to get up and down, it may assist him. And so I don't think there's a credibility issue there when you're talking about truthful testimony. Okay, counsel. Thank you, Your Honors. Good morning, Your Honors. Armand Roth for the Commissioner of Social Security. This is a sympathetic case. However, what the treating records show is that Mr. Saunders' pain was fairly controlled by medication one and a half years before his alleged onset of disability. Was what? I'm sorry, I couldn't understand. One and a half years before he alleged disability. That's about the... What happened 1.5 years? One and a half years. What happened one and a half years? I'm sorry? What happened one and a half years before he alleged disability? Eighteen months. But what happened then? What was it? I'm sorry. At that point, what's going to change when you're alleged onset of disability in August 2005, if you look at the medical records, even as summarized by the ALJ, is not really a change in the effectiveness of the medication. The concern is that he's receiving very strong pain medication, morphine, to control chronic pain, and the concern is it's an addictive medication. So everything that you see up to, let's say, end of 2005, shows actually they've got the concern about continuing the morphine. So in 2005, late 2005 and 2006, they're going to start steroid injections. He's going to get short-term relief only from the steroid injections. And in June 2006... Counsel, could you turn those papers? I'm sorry. I'm sorry. In June 2006, after the steroid injections provide short-term relief, significant short-term, Dr. Rodriguez said we should really consider that you go to a consult for surgery because I'm really concerned about the use of morphine, which is understandable. So that's June 2006. Now, you look at July 2006 to March 2007, there is a gap in treatment records. When he goes back to the emergency, I believe in March 2007, he said he was under morphine in the past. What happened at this point, he's going to see a new doctor. He's going to tell his doctor, again, has hip pain and back pain, which are related, so he's going to be put back on morphine. He was hospitalized at that point, wasn't he? He went to the emergency room. He was released with medication, and it's true he needs strong pain medication. There is no doubt. And then in May of 2007, there's a report here that said from, I guess, a pain consultant. Is that what it is? I'm sorry. In May 2007, he has started to be on morphine. He says to his doctor, I can limit my intake. I can ration my use. You know, there was an issue whether he was going to see a surgeon. He doesn't need to see a surgeon because the addiction appears to be resolved. He says he can limit his intake. His doctor believes he can limit his intake. And if you look at page 310 of the record, which actually builds in the activities of daily living, there is a range, a scale of functionality of how functional he is. He says, first, his pain relief is close to adequate, and the pain is fairly tolerable. And he says that in that range of six elements that he can do all his activities of daily living, what you have below that range is all control, and what you have above that range is that the person can return to his past work. We know this case is not about past work. He was probably doing, like, medium to heavy work as a construction worker. So we believe that what happened with his alleged unsettled disability, when you look at what changed, really, is that concern with the addiction because normally you don't treat chronic pain with morphine because it's typically addictive, like it was in this case for at least some of the time. So this was actually, if you look at the LG's decision before you get all the specifics for credibility, you will see that the LG described not before the alleged unsettled disability, but described everything in the treatment, all the references about control, effective control by medication. And we do believe, Your Honors, that this is crucial in this case. We even believe that the parent believes so because if you look at a parent's reply brief at page seven, there is a claim that pain is not even controlled even by morphine. Page seven of the reply brief, there is no citation to the record for that point. But if you look at the opening brief, what's most interesting, and I will refer you to paragraphs 12, 17, 30, 40, and 44 of the statement of facts of a parent's brief, there is a deletion of every reference to the effectiveness of the treatment he receives, strong pain medication, but in each case, all along the relevant time, it shows, and even before the alleged unsettled disability, it shows there was fair control with medication. So this case is about pain. It's about credibility. It's strong pain medication. I mean, my reaction to your argument is that you have been a very good ALJ and that you have said a lot of interesting things that are not the reasons why the ALJ didn't find him credible. The ALJ said that examinations do not reveal extensive objective findings, which is not the case, that there were objective findings. Then he says there's no radiological testing with regard to the lumbar. Then he relies on Dr. McPhee, who didn't have any records and didn't seem to know what was happening, but he didn't know what was wrong with him. So he didn't – and he was looking at the wrong things. And then we have – then he says that no treating physician assessed limitations on his ability to perform work-related activities. I don't know what the relevance of that is, and that no physician was negative about him. They just didn't do it. And then, finally, he says that nobody prescribed the pain. And I don't know what the relevance of that is. So the reasons he gave, none of them seem terribly relevant. First, Your Honor, before he gives those specific reasons, he actually, the ALJ, described all the objective evidence, because it's relevant first to describe the objective evidence. But your argument now is not that the objective evidence didn't support that there By using really unacceptable pain management, he seems to have relieved the pain. Well, the – so the first thing is that the doctor, when he described the treatment, he described at each time how effective the treatment is. When he's finished with the objective description, he says, for the reason given above and the reason I'm going to describe, I found the allegations of pain to be not fully credible. So they all build one into another. That's the first thing. In addition, the ALJ did not discredit. The ALJ said that, you know, no doctor found that he couldn't do any work. What his doctor told him is that really he shouldn't go back to his past work, which was medium to heavy. And what – I'm sorry. I have to refocus here. That's what his doctor said. So there were a number of reasons that we addressed in the opening brief. Including the activities of daily living that were relatively extensive. We are not saying that – What was extensive about his activities of daily living? Well, you know, he is doing – essentially there is a family of six, four children and a disabled fiancé and himself. He is doing light activities. We are not saying that those activities are transferable. But given – Why are they relevant? I mean, our case law says is that, you know, unless there is a showing that the activities of daily living are transferable to the workplace. They aren't, Ali. A lot of the – you know, I realize that the ALJs grant relief in many cases that we don't see. But, you know, there is this – you sometimes get this feeling that unless the claimant is completely in bed full time, you know, whatever they do during the day is going to be held against them. Your Honor, this is not the case here. I would refer you to page 310 of the transcript, where he is being put back on morphine at that time after a long gap in treatment. And there is a range of functionality, as I said, that places – that includes the activities of daily living and his past work. And he says, now I can do all my activities of daily living. So what we mean by that, by that reference, is actually something that goes together with the fact that his pain is amenable to control. It reinforces the description of treatment and effectiveness of medication by the ALJ. So it's also relevant in that respect. In particular in that respect, but not only, because he is saying essentially he cannot do – it's not about can you work. It's about I can't even raise eight pounds. I can't even do any of those activities. It's not all the I cannot work. It's all the specific allegations that he cannot do certain things like – Ultimately, what this case comes down to for me is the ALJ discredited him with regard to pain entirely, i.e., he did not build in any pain. He did not build in any pain consideration to the hypothetical for the VE, or did he just discredit him somewhat? In other words, did he build into the requirements for the job the fact that he was in some pain? Yes, absolutely. Where is that? Because the objective evidence – well, the objective evidence – But I want to know where in the record can we tell that in fact he wasn't saying he was in no pain, but he was saying he was not. Well, when you see actually the ALJ first recognizes after evaluating the medical evidence, in particular Dr. McPhee, that there is other evidence in this case that suggests that he cannot do medium work. The only other evidence in this case that you have that he cannot do medium work it's not, as we say, there are no treating physicians that find any limitations. It's based on his subjective allegations. So as you understand – this is what I'm trying to be clear about. Yes. When you understand what the ALJ did, it was to conclude that his pain was under control and therefore pain was not a consideration in his – Pain was a consideration. I'm sorry. I'm sorry? Pain was a consideration. That's what I want to know. Where in the record can we tell that the ALJ in fact built – because that seems to me to be perhaps a fair assessment of the record, but I thought that the ALJ had just discounted the pain entirely. Well, what happens essentially is you see at the end of 2005, before 2005, some of his doctors found the objective, let's say, they found that there was very little, there was no significant pathology. Then you have Dr. McPhee that found he can do medium work. The ALJ says there is other evidence in the record that suggests first the examiner had only recent view of that – had only examined a palate in November 2005. And then the ALJ realized and acknowledged that there was other evidence in the record since that examination suggesting greater limitations. Go ahead, Dinesh. And that's why in his RFC you would find the specific limitations that we discussed like no trolling, the sit-stand option, all those things. They don't come from the objective medical evidence. Well, presumably the sit-stand option suggests that he – I understand the argument the sit-stand option was that he could sit and stand intermittently throughout the day. Right? Which suggests that pain wasn't a factor at all in the formulation of the hypothetical because, as I recall, Saunders testified that he needed to lay down during the day. He needed to rest during the day. In that respect, in that – To the pain. In that specific respect, the ALJ didn't find that allegation to be credible. Right. So he – So he alluded pain from the hypothetical that he posed to the – He just excluded the pain. I'm past my time, Your Honors, but I will maintain. You can answer, Judge Bresan. And Judge Fines is, too. Same question. He excluded the pain. He would have found the limitations supported by the objective medical evidence, which are very little. His limitations are essentially limitations based on pain. You look at this case. This is a case. They're not so little. I mean, all the way through he was diagnosed with lumbar and cervical problems of some significance, and the ALJ says that. That supports that there is some basis for his pain. But those diagnoses in themselves are not limitations, Your Honor. Thank you. Thank you. Thank you, counsel. Counsel, I'll give you one minute for rebuttal. Thank you, Your Honors. You know, I think you nailed the nail on the head with this one in that we have chronic pain. He's been prescribed very, very strong narcotics. They did injections. They recommended ablation therapy. He had financial problems. And I believe that Mr. Sondra's credibility does remain intact. He's done everything he could with the limited means that were available to him. One last question. What is the law about finance? First of all, the financial problems aren't that clear in the record, but there's certainly some intimation. Suppose we could read the record to say that he was advised to have surgery, but he couldn't afford it. Where does that leave us legally? Your Honor, the way the Social Security regulations are written, in order to impinge or impugn his credibility, you'd have to find a degree of noncompliance. And the regulations state that you can't find noncompliance if he's got an adequate reason not to do the specific treatment that's recommended. And those adequate reasons include an inability to afford the treatment. In addition to that, if the treatment is extensive, such as surgery, then fears or concerns that are reasonable is also a factor for not going through with that. So in this particular case where the defendant concedes that there is a high degree of pain with prescription of morphine and narcotic pain medications, if the individual can't afford the treatment, in particular even not getting all his medications, which the record does indicate, then you have to look at the degree of pain he's actually suffering from, because that's a legitimate reason not to have the medication. And then, of course, we go back to Mr. Saunders' testimony regarding the effect of that treatment and his need to rest and lie down during the day, which all is consistent with this particular record. Okay. Thank you, counsel. Thank you. We appreciate the argument from counsel. The matter is submitted. Thank you.
judges: Paez, Berzon, Bea